### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

**vs.**                                                                 **No. 2:16-cr-00580-RB**

**JOSE REMBERTO GUZMAN-
DOMINGUEZ and MIGUEL ANGEL
RODRIGUEZ-FLORES,**

      **Defendants.**

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on notices of intent (a) to offer expert testimony of three witnesses for the Government (Docs. 32; 28; 50; 35) and one witness for Defendants (Doc. 64); (b) for the Government to introduce as self-authenticating evidence: a Pilot Travel Receipt (Doc. 40); a Flying J Receipt (Doc. 41); Sprint cell phone records (Doc. 42); Metro PCS cell phone records (Docs. 60; 70); Mirachem internal records (Doc. 43); Mirachem e-mails (Doc. 44); and bank records (Doc. 45); (c) for the Government to introduce evidence, pursuant to Federal Rule of Evidence 404(b)(2), text messages (Doc. 49) and bank statements (Doc. 51); (d) for the Government to have certain telephone calls admitted (Doc. 39); (f) for the Government to have certain photographs admitted (Doc. 48); and (f) for Defendants to have the following evidence excluded: citizenship/residence status/national origin of all witnesses, Defendants' trips to El Salvador and Mexico, Defendants' girlfriends, locked cell phones, previous use of Mr. Guzman-Dominguez's car to smuggle marijuana, and criminal history (Doc. 71).

Having reviewed the parties' submissions and considered their arguments regarding expert witnesses, the Court **ORDERS** that Department of Homeland Security (DHS) Forensic Scientist

Dustin James (Doc. 32); Drug Enforcement Administration (DEA) Special Agent Joseph Montoya (Doc. 28); and New Mexico State Police Officer Davin Barela (Doc. 53) are qualified to provide expert testimony to the extent discussed in this order.  The Court further **ORDERS** that the following documents require no additional authentication at trial: The Pilot Center Travel receipt (Doc. 40); The Flying J receipt (Doc. 41); The Sprint cell phone records (Doc. 42), except for the Key to Understanding Document; The internal Mirachem records (Doc. 43), except for training documents described in this order; The Mirachem e-mails written by Mirachem employees (Doc. 44); The Wells Fargo bank records (Doc. 45); and The Metro PCS cell phone records (Doc. 61). The Court **GRANTS** United States Motion *In Limine* Regarding Admissibility of Evidence (Doc. 39) and **DENIES** United States' Motion *In Limine* Regarding Admissibility of Photographs of Jose Remberto Guzman-Dominguez Wearing a Sidearm Pistol and a Joaquin "El Chapo" Guzman T-Shirt (Doc. 48).

The Court **DENIES** in part Defendants' Motion in Limine to Exclude Irrelevant and Unfairly Prejudicial Evidence (Doc. 71) as it relates to evidence of Mr. Guzman Dominguez's or any other witness's residency, citizenship status, or national origin (*see* Doc. 71 at 3–4) as discussed in this order; Defendants' trips to El Salvador and Mexico (*see* Doc. 71 at 4–5) as discussed in this order; Mr. Guzman's locked Apple iPhone (*see* Doc. 71 at 5–6) as described in this order; evidence on cell tower data (*see* Doc. 71 at 6) as described in this order; and reference to Defendants' Honda Accord (*see* Doc. 71 at 6) as described in this order.   The Court **GRANTS** in part Defendants' Motion in Limine to Exclude Irrelevant and Unfairly Prejudicial Evidence (Doc. 71) as it relates to evidence of Defendants' girlfriends and alleged womanizing (*see* Doc. 71 at 5); and other locked phones that have been seized (*see* Doc. 71 at 5–6).

The Court defers for trial the determination on the remaining issues.

2

## I.       BACKGROUND

A little past midnight on November 14, 2015, Mr. Guzman-Dominguez pulled his registered commercial tractor-trailer into the Lordsburg, New Mexico, port of entry.   (Docs. 37 at 2; 38 at 3.)   Mr. Rodriguez-Flores was riding as a passenger.   (Doc. 38 at 3.)   Inspector Jesus Salcedo, who was working at the port that evening, stopped Mr. Guzman-Dominguez and directed him to pull into an inspection bay.   (Docs. 37 at 3; 38 at 3.)   At the inspection bay, Mr. Rodriguez-Flores told Inspector Salcedo that he was riding with Mr. Guzman-Dominguez because he wanted to get his own commercial driver's license.   (*Id.*)

Inspector Salcedo took nearly an hour inspecting the outside of the truck and trailer, checking the brakes, checking the tires and wheels, and inspecting the engine compartment. (Docs. 37 at 3 and 38 at 3.)   At some point during the inspection, Mr. Guzman-Dominguez used an Apple iPhone to make a call.   (*See* Doc. 74 at 5.)   Inspector Salcedo next informed Mr. Guzman-Dominguez that he was going to inspect the cargo area.   (Doc. 37 at 3.)   The cargo area was loaded with cleaning solution, as declared in the bill of lading.   (*Id.*)   At the front of the trailer, Inspector Salcedo discovered four cardboard boxes, which contained bundles wrapped in green cellophane.   (Doc. 38 at 4.)   The bundles later tested positive for cocaine and heroin. (Docs. 32-2; 32-3.)   In all, law enforcement seized 47.9 kilograms of cocaine and 5.24 kilograms of heroin.   (*See* Doc. 50 at 2.)

After arresting Defendants, law enforcement impounded the vehicle and seized several items.   They seized an Apple iPhone "in connection with the arrest" of Mr. Guzman-Dominguez and another smart phone "in connection with the arrest" of Mr. Rodriguez-Flores.   (Doc. 38 at 6.) Law enforcement also seized several other phones from the tractor cab.   (*Id.*)   They obtained search warrants for the phones, and gained access to all but one of the smart phones found in the

truck.   (*Id.*)

On the Apple iPhone, law enforcement found a suspicious text message exchange with an unidentified number.   Law enforcement also found numerous pictures of Mr. Guzman-Dominguez on the phone, including several with Mr. Guzman-Dominguez wearing a t-shirt with a photograph of Joaquin "El Chapo" Guzman on the front.   (*See* Doc. 48-2.)   The t-shirt also includes the words "Billionaire" printed on top and other phrases, including "The LAST NARCO[,]" surrounding the photograph.   (*Id.*)   Mr. Guzman-Dominguez is wearing what appears to be a sidearm pistol.   (*Id.*)   Lastly, law enforcement found a photograph on the phone of a debit card with the name "Jose R. Dominguez" and later subpoenaed the bank for the records associated with the account.   (Doc. 51 at 3.)

Inside the tractor cab, law enforcement also found a commercial seal, which corresponded with the bill of lading.   (Doc. 73 at 34:6–12.)   Typically, the seal locks the cargo inside the trailer throughout the delivery.   (*See id.* at 36:1–12.)   Once the seal is broken, it cannot be used again. (*Id.* at 35:9–11.)   This seal had never been locked.   (*Id.* at 36:1–3.)

Law enforcement interrogated Defendants on the night of their arrest.   (*See* Doc. 48-4.) Mr. Rodriguez-Flores told law enforcement that they were delivering the load to Pennsylvania and he did not know about the drugs in the truck.   (*Id.* at 19, 20.)   He also told law enforcement that they had just come back from a trip to El Salvador and Mexico.   (*Id.* at 10.)   While in Mexico, Mr. Guzman-Dominguez apparently visited "another wife" in Mexico.   (*Id.* at 9.)   Mr. Rodriguez-Flores admitted he went to Mexico to "go with the girls" and that he has a girlfriend, a wife, and a lover.   (*Id.* at 10, 26.)

In subsequent investigations, law enforcement discovered that Mr. Guzman-Dominguez was transporting the load of chemicals for Mirachem, which had been arranged by a broker, C.H.

Robinson.  (*See* Doc. 44-1 at 6–8.)  Based on e-mail communications between Mirachem and C.H. Robinson, Mr. Guzman-Dominguez was late to pick up the load the day before.  (*See id.* at 2–6.)

Lastly, several notable calls were made from the Luna County Detention center six days after Mr. Guzman-Dominguez was arrested.  First, Homeland Security Investigation Taskfoce Officer Jose Lopez received two calls from a Luna County Detention Center detainee who identified himself as Jose Guzman-Dominguez.  (Doc. 39 at 1.)  That same day, Mr. Guzman-Dominguez called his wife multiple times.  (Doc. 39-1 at 2.)  All of the calls indicated, in Spanish, that the call was "subject to being supervised and recorded."  (*See, e.g.*, Doc. 39-4 at 1.)  Mr. Guzman-Dominguez discussed his attempt to reach "the dude," asked his wife to call the person, and asked her to call the DEA.  (Doc. 39-1 at 2.)  Mr. Guzman-Dominguez asked that his wife tell the DEA that it was "urgent" that he speak with someone.  (Doc. 39-2 at 2.)  He told her, "Tell him . . . I have information . . . in regards to my case . . . ."  (Doc. 39-1 at 2.)  He also told her to ask if the DEA would speak with him if he renounced his attorney, as his attorney did not want to "cooperate."  (Doc. 39-4 at 2.)  Then, he also told his wife that it was "in [her] hands that [he] get out."  (Doc. 39-3 at 3.)  Lastly, Officer Lopez received, but did not accept, a call from a woman identifying herself as Mr. Guzman-Dominguez's wife.  (Doc. 39 at 1.)

## II.    ANALYSIS

Evidence is admissible if it is relevant and does not violate the United States Constitution, a federal statute, the Federal Rules of Evidence, or other rules promulgated by the U.S. Supreme Court.  Fed. R. Evid. 402.  "Evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed R. Evid. 401.  Relevance is not inherent to any type of evidence,

but rather exists only as the evidence relates to "a matter properly provable in the case." *Huddleston v. United States*, 485 U.S. 681, 689 (1988) (quoting Fed. R. Evid. 401 advisory committee's note to 1972 Proposed Rules).   Still, the relevancy bar "is 'very low'" and "must only provide a 'fact-finder with a basis for making some inference, or chain of inferences.'" *United States v. Jordan*, 485 F.3d 1214, 1218 (10th Cir. 2007) (quoting *United States v. McVeigh*, 153 F.3d 1166, 1190 (10th Cir. 1998) *disapproved of on other grounds by Hooks v. Ward*, 184 F.3d 1206 (10th Cir. 1999)).

Relevant evidence must still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."  *Jordan*, 485 F.3d at 1218 (quoting Fed. R. Evid. 403).   This balancing test, like the bar for relevance in general, favors admission, and "exclusion under [Rule 403] is 'an extraordinary remedy [that] should be used sparingly.'"   *United States v. Watson*, 766 F.3d 1219, 1241 (10th Cir. 2014) (quoting *United States v. Irving*, 665 F.3d 1184, 1213 (10th Cir. 2011)).   "To be inadmissible under [R]ule 403, evidence must do more than 'damage the [d]efendant's position at trial'" it must "make[] a conviction more likely because it provokes an emotional response in the jury or otherwise tend[] to affect adversely the jury's attitude toward the defendant *wholly apart* from its judgment as to his guilt or innocense [sic] of the crime charged."   *United States v. Becker*, 230 F.3d 1224, 1232 (10th Cir. 2000) (quoting *United States v. Tan*, 254 F.3d 1204, 1211–12 (10th Cir. 2001)).

### A.  Expert Testimony

The Government filed three notices of intent to offer expert testimony (Docs. 32, 28, 35) and Defendants filed one notice of intent to offer expert testimony (Doc. 64).   The Government seeks to offer expert testimony of Department of Homeland Security (DHS) Forensic Scientist

6

Dustin James (Doc. 32), Drug Enforcement Administration (DEA) Special Agent Joseph Montoya (Docs. 28, 50), and New Mexico State Police Officer Davin Barela (Doc. 35). Defendants seek to introduce the expert testimony of former DHS Federal Criminal Investigator and Special Agent Robert Alvarez. (Doc. 64.)

Rule 702 of the Federal Rules of Evidence allows expert testimony where:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and method to the facts of the case.

Fed. R. Evid. 702.

Rule 702 requires a district court to assess proffered expert testimony to ensure it is both relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993) (scientific knowledge); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, (1999) (technical and other specialized knowledge). "[T]he district court generally must first determine whether the expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion" that will assist the trier of fact. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc) (quoting Fed. R. Evid. 702). If the expert is sufficiently qualified, then "the court must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology." *Id.* "[T]he test of reliability is 'flexible,'" *Kumho Tire Co.*, 526 U.S. at 141, and a district court has discretion in how it performs its gatekeeping function, *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000). Still, "when faced with a party's objection, [the court] must adequately demonstrate by specific findings on the record that it has performed its duty as gatekeeper." *Id.*

Although expert witnesses may offer testimony that "embraces an ultimate issue[,]" expert witnesses in a criminal case cannot offer testimony "about whether a defendant had 'a mental state or condition that constitutes an element of the crime charged or of a defense.'"  *United States v. Medina-Copete*, 757 F.3d 1092, 1106 (10th Cir. 2014) (quoting Fed. R. Evid. 704(b)).  "Experts may 'properly testify to facts or opinions from which the jury could conclude or infer that' a defendant had a required mental state, but the 'final inference is for the trier of fact alone.'"  *Id.* (quoting *United States v. Archuleta*, 737 F.3d 1287, 1298 (10th Cir. 2013)).

     i.     *Mr. James is sufficiently qualified and his opinion is reliable to testify as an expert on forensic chemistry and the identification of controlled substances.*

The Government seeks to introduce Mr. James to testify about tests he performed on the various samples seized in connection with this case.   (Doc. 32 at 2.)   The Government anticipates that Mr. James would testify that samples from the bundles found in Mr. Guzman-Dominguez's trailer tested positive for cocaine and heroin.   (Docs. 32 at 2; 32-2; 32-3.)   Mr. James has worked as a DHS Forensic Scientist for four years, where he has overseen in-depth analysis of evidence of drugs.   (32-1 at 1.)   He has a bachelor's degree in Chemistry from New Mexico State University and has received training in Agilent Chemstation and Mass Hunter Data Acquisition.   (*Id.*) Defendants do not object to his testimony.   (Doc. 53 at 2.)   Mr. James has sufficient education, training, and experience to be qualified to testify regarding forensic chemistry and identification of controlled substances and his proffered testimony is sufficiently reliable.   *See Nacchio*, 555 F.3d at 1241.   Therefore, he is qualified as an expert.

     ii.     *Agent Montoya is sufficiently qualified and his opinion is reliable to testify as an expert on drug trafficking, but the Court limits certain aspects of his testimony.*

The Government seeks to introduce Agent Montoya as an expert in drug trafficking and the operations of drug trafficking organizations.   (Doc. 28 at 1.)   Specifically, the Government

anticipates that Agent Montoya will speak about (1) the ways drug smugglers "package, conceal, transport, and distribute cocaine and heroin throughout the United States, including" how tractor trailers conceal drugs within a load of genuine cargo and the use of commercial seals in such practices; (2) the ways drug trafficking organizations recruit couriers; (3) the way drug traffickers monitor drug loads; (4) "the value of the cocaine and heroin seized in this case"; (5) the way cocaine and heroin become worth more as they move away from the border region; (6) the quantity of cocaine in this case being consistent with a distribution quantity; (7) the quantity of heroin in this case being consistent with a distribution quantity; (8) that use of blind couriers in this case would be inconsistent with general practices of smuggling cocaine; and (9) that use of blind couriers in this case would be inconsistent with general practices of smuggling heroin.  (*Id.* at 3–4.)  The Government also anticipates that Agent Montoya will testify regarding "the use of structure[d] case deposits as [a] business practice of drug traffickers."  (Doc. 74 at 8.)  The Government also sought to have Agent Montoya qualified as an expert to testify regarding the meaning of a text message discovered on Mr. Guzman-Dominguez's phone.  (Docs. 49; 59; 69; Hr'g Tr. 29:3–39:13.)  After the hearing, however, the Government provided notice that it no longer seeks to introduce such testimony (Doc. 78).

Law enforcement agents may qualify as experts under Rule 702 in the area of drug trafficking if their knowledge, skill, or training so permits.  *United States v. Roach*, 582 F.3d 1192, 1206–07 (10th Cir. 2009).  Such expert testimony is admissible "because the average juror is often innocent of the ways of the criminal underworld."  *United States v. Kamahele*, 748 F.3d 984, 998 (10th Cir. 2014).  Specifically, courts routinely allow law enforcement officers to testify as experts regarding "typical indicia of drug trafficking activity."  *United States v. Lovern*, 590

F.3d 1095, 1102 (10th Cir. 2009).   Such an expert may appropriately testify about typical tools of the trade, including evidence found at the arrest scene, *Becker*, 230 F.3d at 1231.

Defendants first object to "testimony that would draw an explicit conclusion linking this case" to other cases Agent Montoya has investigated or typical cases based on his experience. (Doc. 53 at 4.)   To the extent that any testimony involves Defendants' knowing transportation of drugs (*see* Doc. 28 at 3–4), Agent Montoya may not offer any opinion that resolves the final issue, Defendants' mental status, for the jury.   *See Medina-Copete*, 757 F.3d at 1106.

Defendants also request voir dire to determine Agent Montoya's expertise on drug traffickers' use of commercial seals to help conceal and transport drugs and their use of structured cash deposits to avoid detection.   (*See* Docs. 71 at 6; 74 at 7–9.)   The Court will allow voir dire during trial and will defer determining Agent Montoya's expertise on these matters at that time.

Based on the parties' current arguments, Agent Montoya is otherwise qualified and can offer reliable testimony on drug trafficking and drug trafficking organizations within the limitations described above.

iii.    *Officer Barela is sufficiently qualified and his opinion is reliable to testify as an expert on commercial trucking, but the Court limits certain aspects of his testimony.*

The Government seeks to qualify Officer Barela to opine on

(1) the use of and information contained on bills of lading in the commercial trucking industry, including Mirachem Bill of Lading Number 69861; (2) the types and use of commercial seals in the commercial trucking industry, including Mirachem Seal 0001573; (3) the function of and information contained in a Driver's Daily Log, including Jose Remberto Guzman-Dominguez's Driver's Daily Log for November 12, 2015 and November 13, 2015; (4) regulatory requirements for commercial truckers regarding hours on duty and hours driving and hours off duty and hours in sleeper berth; and (5) general practices of commercial truckers, including the use of brokers in acquiring loads and the general practice among commercial truckers of attempting to deliver loads as quickly as possible.

10

(Doc. 35 at 2.)   Defendants object that Officer Barela lacks sufficient skill, experience or knowledge to qualify as an expert on the general practices of truck drivers and common industry practices.   (Doc. 53 at 7.)

At the hearing, Officer Barela testified that he has served as an officer for the New Mexico State Police Commercial Vehicle Enforcement Bureau for almost four years.   (Hr'g Tr. 3:20)[1] He regularly inspects commercial trucks in the course of his official duties and is certified by the United States Department of Transportation, Federal Motor Carrier Safety Administration.   (*Id.* at 3:24–4:1; Doc. 35-1 at 2–5.)   In his four years, Officer Barela has inspected over one thousand trucks.   (Hr'g Tr. at 4:25.)   During the inspections process, Officer Barela regularly comes across drivers' daily logs and bills of lading and he is familiar with the rules and regulations associated with them.   (Hr'g Tr. 5:1–7, 13–19.)   He also encounters commercial seals on a daily basis and has received training on the use of those seals.   (*Id.* at 5:20–25.)   Officer Barela has never brokered a load or worked with commercial truck drivers in acquiring a load of goods.   (*Id.* at 7:11–17.)   He has never worked as a commercial truck driver, but he speaks with commercial truck drivers on a daily basis and has noticed that truckers are generally anxious to get back on the road because they typically do not make money for time they are not in transit.   (*Id.* at 6:7–11, 7:7–8, 11:1–14.)

Although the *Daubert* factors are flexible, Rule 702 requires that district courts "ensure that proffered expert testimony be 'based on sufficient facts or data' and 'the product of reliable principles and methods.'"   Fed. R. Evid. 702.   "[P]olice officers can acquire specialized knowledge of criminal practices and thus the expertise to opine on such matters," *Medina-Copete*,

---

[1]  The Court's citations to the hearing transcript refer to the original, unedited version of the transcript taken for the hearing on June 29, 2016.   Any finalized transcript may contain different page and/or line numbers.

757 F.3d at 1104 (quoting *United States v. Garza*, 566 F.3d 1194, 1199 (10th Cir. 2009)), but if they rely "solely or primarily on experience[, they] . . . must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts," *id.* (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment).

Officer Barela's testimony established that he has sufficient training and experience to testify as to the rules and regulations of commercial trucking, information typically contained in required documentation, and the types and uses for commercial seals in the trucking industry. (*See, e.g.*, Hr'g Tr. 3:20, 3:24–4:1, 4:25.)   Based on this evidence the Court further determines that his testimony on these topics would be reliable.   (*See e.g.*, *id.*at 5:1–7, 13–19, 20–25.)   *See Medina-Copete*, 757 F.3d at 1104.   Similarly, Officer Barela has sufficiently explained how his observations regarding truck drivers have led him to the conclusion that they are typically eager to get back on the road and deliver their loads as quickly as possible.   (*See* Hr'g Tr. 6:7–11, 7:7–8, 11:1–14.)   The Government has not, however, provided sufficient evidence to show that Officer Barela has knowledge regarding other general practices of truck drivers and the industry.   (*See id.* at 7:11–17.)

Thus, Officer Barela is qualified to testify as an expert in the regulations of commercial truck driving and practices involving commercial seals and a general desire to deliver their loads as quickly as possible, but he may not testify as to other general practices of commercial truckers without further foundational support.

    iv.    *The Court defers determination of whether Mr. Alvarez is qualified and his opinion reliable to testify as an expert on drug trafficking practices within the United States.*

Defendants seek to offer Mr. Alvarez as an expert "in the common practices and characteristics of drug trafficking within the United States . . . ."  (Doc. 64 at 3.)  Mr. Alvarez worked as a U.S. Customs Special Agent for six years in McAllen, Texas, from 1992 to 1998.  (*See id.* at 2; Doc. 64-1 at 1.)   After that, he spent another sixteen years working for Customs and DHS, mostly in Spokane, Washington, but also on detail in Panama and Honduras.   (Doc. 64-1 at 1–2.)

When considering law enforcement expertise, courts must "consider[] the relevance [and] breadth of [the witness's] experience," in order to ensure that the witness's opinion is sufficiently based on facts or data as required by 702(b).  *Medina-Copete*, 757 F.3d at 1105.

The Government requests voir dire to determine whether Mr. Alvarez is sufficiently qualified to testify about drug trafficking across domestic points of entry, the value of drugs, and current drug trafficking practices along the southern border.  (Doc. 67 at 2–3.)   The Court will allow voir dire during trial and will defer ruling on these matters until that time.

### B.  Self-Authenticating Business Records

The Government filed seven notices of intent to introduce self-authenticating evidence: a receipt from Pilot Travel Center (Doc. 40); a receipt from Flying J (Doc. 41); Sprint cell phone records, (Doc. 42); internal Mirachem documents (Doc. 43); an e-mail exchange between Mirachem and C.H. Robinson (Doc. 44); bank records from a Wells Fargo bank account (Doc. 45); and Metro PCS cell phone records (Docs. 61; 70).   Defendants object to a Key to Understanding document in the Sprint cell phone records (Doc. 42-1 at 5), all training documents in the Mirachem internal documents (Doc. 43-2), and all e-mails authored by C.H. Robinsons' employees in the

Mirachem e-mail exchange (*see* Doc. 44-1 at 2–7) as inadmissible pursuant to the business records rule.   (Doc. 53 at 8–9.)   Defendants also object to the Sprint cell phone records (Doc. 42) and the bank records (45) as irrelevant.   (Doc. 53 at 8, 11.)

Business records can be admissible as exceptions under the hearsay rule.   Fed. R. Evid. 803(6).   A document qualifies as a business records if (1) a person with knowledge of an event recorded the event at or near the time it occurred; (2) the record "was kept in the course of a regularly conducted activity" of that business; (3) the record was made "as a regular practice of that activity"; (4) a custodian testifies or certifies that these conditions are shown; and (5) the opponent to the document does not show that the document was made in a way or under circumstances that lack trustworthiness.   *Id.*   If a custodian or other qualified witness certifies that a document meets the first two conditions, the document "require[s] no extrinsic evidence of authenticity in order to be admitted."   Fed. R. Evid. 902.   Notably, a determination that documents are authentic does not automatically make documents admissible.   *See* Fed. R. Evid. 901, advisory committee's note to 1972 Proposed Rules ("Authentication and identification represent a special aspect of relevancy.").

Business records can contain "double hearsay[,]" which exists "when the record is prepared by an employee with information supplied by another person."   *United States v. Blechman*, 657 F.3d 1052, 1065 (10th Cir. 2011) (quoting *United States v. Gwathney,* 465 F.3d 1133, 1141 (10th Cir. 2006)).   Specifically, the business record exception does not apply "[i]f the person who provides the information is an outsider to the business who is not under a business duty to provide accurate information . . . ."   *Id.*

Defendants do not object to the Pilot Travel Center and Flying J Receipts (Docs. 40, 41), and thus the Court determines they do not require additional authentication at trial.   Next,

Defendants' objections to records in Docs. 42, 43, 45, and 61 have all been resolved as to authentication.   The Government no longer plans to use the Sprint Key to Understanding document (Doc. 42-1 at 5) and will instead call a witness to explain the records.   (Doc. 58 at 2.) As for the Mirachem training documents (43-2), the Government now only seeks to introduce one document, the diagram of Mirachem's patterns for loading equipment onto commercial vehicles (Doc. 43-2 at 13), with the title and paragraph of text redacted.   (Hr'g Tr. 24:17–26:1.) Defendants do not object to this document as redacted.   (*Id.* at 26:3–5.)   The remaining relevancy issues for all of these documents do not pertain to their self-authentication.   *See* Fed. R. Evid. 901, advisory committee's note to 1972 Proposed Rules.   Without other objections, all of the records, excluding the Key to Understanding document (Doc. 42-1 at 5) and training documents (Doc. 43-2)—apart from the redacted diagram (*id.* at 13), can be properly self-authenticated.   *See* Fed. R. Evid. 902(11).

Regarding the Mirachem e-mail exchange (Doc. 44-1), the Government produced a certification from a custodian on behalf of Mirachem, but did not provide certification from a custodian representing C.H. Robinson, the other participant in the exchange.   Defendants assert that C.H. Robinson's portion of the exchange has thus not been authenticated.   (Doc. 53 at 10–11.)   The Government intends to call a witness from C.H. Robinson to attest to the authenticity of the e-mail exchange.   (Doc. 58 at 3; Hr'g Tr. at 28:13–14.)   The Court determines that the Mirachem portion of the e-mail exchange has been authenticated, but defers determination of the C.H. Robinson portion until trial.

### C.   404(b) Evidence

Generally, parties may not offer evidence of extrinsic acts to show a person's character and prove that the person acted in accordance with that character at a specific time.   Fed. R. Evid.

404(b)(1).   Evidence of such extrinsic acts is, however, admissible to prove other relevant issues,

such as knowledge.   Fed. R. Evid. 404(b)(2).   "Extrinsic acts evidence may be critical to the

establishment of the truth as to a disputed issue, especially when that issue involves the actor's

state of mind and the only means of ascertaining that mental state is by drawing inferences from

conduct."   *Huddleston*, 485 U.S. at 685.   Notably, "prior narcotics involvement is relevant when

that conduct is close in time, highly probative, and similar to the activity with which the defendant

is charged."   *Watson*, 766 F.3d at 1239 (quoting *Becker*, 230 F.3d at 1232).   Extrinsic acts

evidence must also survive the relevance and probative value analysis.   *See* Fed. R. Evid. 401,

403.   In considering all of these rules, courts apply the *Huddleston* test, which requires that:

> (1) the evidence [is] offered for a proper purpose under [Rule 404(b); (2) the
> evidence [is] relevant under [Rule] 401; (3) the probative value of the evidence [is]
> not substantially outweighed by its potential for unfair prejudice under [Rule] 403;
> and (4) the district court, upon request, instruct[s] the jury pursuant to [Federal Rule
> of Evidence] 105 to consider the evidence only for the purpose for which it was
> admitted.

*Becker,* 230 F.3d at 1232.

### i.     *The Text Message Motion is Dismissed as Moot*

Following the hearing, the Government rescinded its motion (Doc. 49) to introduce a text

message from an unknown source, which the Government alleges was in furtherance of a drug

trafficking conspiracy.   (Doc. 78.)   As such, the Court dismisses the Government's notice

regarding the text message (Doc. 49) as moot.

### ii.     *The Court defers its decision on the relevancy of the bank statements, as it does not have sufficient information on the actual documents the Government intends to introduce.*

The Government also seeks to introduce Mr. Guzman-Dominguez's bank statements,

which it argues provide evidence of drug trafficking based on unexplained income and structured

cash deposits.   (Doc. 51 at 5; 57 at 1–2.)   Mr. Guzman-Dominguez received approximately $111,623.84 in deposits from January 30 through November 14, 2015.   (Doc. 57 at 1–2.)   Only $31,158.04 came from C.H. Robinson.   (*Id.*)   In fact, Mr. Guzman-Dominguez received more in cash, $34,774.00, than he did from C.H. Robinson.   (*Id.*)   Additionally, several times throughout the year, Mr. Guzman-Dominguez made multiple, large cash deposits on the same day.   (*See id.* at 3 (providing seven examples, including deposits of $3,000, $3,000, and $1,200 in a single day and another day with six deposits ranging from $600 to $100).

"[E]vidence of a defendant's association with sizeable amounts of cash may be probative of his or her involvement in [a drug distribution] business, and thus bear on the question of [the] defendant's guilt . . . ."   *United States v. Martinez*, 938 F.2d 1078, 1085 (10th Cir. 1991).   Alternate explanations for the source of cash "go[] to the weight of the evidence, not its admissibility."   *Id.*.   A sudden acquisition of money can create a "natural and prominent hypothesis" that the money was acquired through illicit means, *id.* (quoting 1A J. Wigmore, *Evidence* § 154, at 1764 (1983)), but more relevantly for the Tenth Circuit, unexplained cash corresponds to the "'cash-and-carry' nature of the drug trade[,]" *id.* (quoting *United States v. McDonald,* 933 F.2d at 1522 (10th Cir. 1991)).   District courts and other circuits have further held that unexplained wealth, not just cash, can be "highly probative in a narcotics prosecution . . . ." *United States v. Davis*, 789 F. Supp. 1130, 1132 (D. Kan. 1992) (citing *United States v. Stubbs*, 944 F.2d 828, 836 (11th Cir. 1991); *United States v. Patterson*, 819 F.2d 1495, 1501 (9th Cir. 1987); *United States v. Grandison*, 783 F.2d 1152, 1156 (4th Cir. 1986); *United States v. Young*, 745 F.2d 733, 762–63 (2d Cir. 1984); *see also United States v. Penny*, 60 F.3d 1257, 1263 (7th Cir. 1995).   To create a permissible inference of drug operations, courts should examine "the defendant's substantial wealth . . . and the legitimate sources of his income."   *Davis*, 789 F. Supp.

at 1132.

Although the Government has provided examples of the evidence it intends to introduce, it has not provided the Court with the actual documents.  (*See* Doc. 51.)  As the description of "banking records related to [Mr. Guzman-Dominguez] for the 2015 calendar year" is general and may include both relevant and irrelevant material, the Court defers this matter until trial.

**D.  Telephone Motion in Limine**

The Government seeks to introduce transcripts of telephone calls that Mr. Guzman-Dominguez allegedly made to Homeland Security Investigation Taskforce Officer Jose Lopez, calls between Mr. Guzman-Dominguez and his wife regarding attempts to contact the DEA, and calls his wife made to the DEA.  (Doc. 39.)  Mr. Guzman-Dominguez objects that his comments are protected by the Fifth Amendment right to silence and his calls are irrelevant.[2] (Doc. 53 at 11–13.)

The Fifth Amendment protects a defendant's right to be silent and forbids the prosecution from commenting on a defendant's decision to exercise that protection.  *Griffin v. California*, 380 U.S. 609, 615 (1965).  The government cannot use a defendant's refusal to speak to law enforcement against the defendant during trial, even to impeach a subsequent explanation offered at trial.  *Doyle v. Ohio*, 426 U.S. 610, 618 (1976).  Conversely, the prosecution may impeach a defendant who speaks to investigators, after waiving *Miranda* rights, and later offers conflicting testimony at trial.  *Anderson v. Charles*, 447 U.S. 404, 408 (1980).  In such cases, no protection exists because "the defendant has not remained silent at all."  *Id.*  Additionally, a defendant may selectively exercise his right to remain silent, either by not answering questions initially but later

---

[2]  The Government sua sponte raised and refuted potential issues regarding hearsay and marital privilege.  (Doc. 39 at 5–8, 9–11.)  Defendants did not address these arguments and the arguments fail as a matter of law.

deciding to answer questions, *Berghuis v. Thompkins*, 560 U.S. 370, 388 (2010), or by beginning to answer questions and then refusing, *Miranda v. Arizona*, 384 U.S. 436, 445 (1966) ("[T]he mere fact that [a defendant] may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned."). In either case, the government cannot use the defendant's decision to be silent against the defendant, *Doyle*, 426 U.S. at 618, but the government may use a defendant's failure to be silent against the defendant, *Berghuis*, 560 U.S. at 388. *See also Hurd v. Terhune*, 619 F.3d 1080, 1087 (9th Cir. 2010) ("A suspect may remain selectively silent by answering some questions and then refusing to answer others without taking the risk that his *silence* may be used against him at trial.") (emphasis added).

Mr. Guzman-Dominguez argues that the Government cannot introduce evidence of phone calls to his wife, because it would violate his Fifth Amendment rights by "introducing evidence that [Mr. Guzman-Dominguez] refused to cooperate with law enforcement after previously speaking with officers or otherwise agreeing to cooperate." (Doc. 53 at 12 (citing *Hurd*, 619 F.3d at 1087.) This argument fails because the Government does not seek to introduce any evidence regarding Mr. Guzman-Dominguez's subsequent refusal to answer questions. Instead, it seeks only to introduce evidence that, shortly after Mr. Guzman-Dominguez's arrest, Mr. Guzman-Dominguez urgently wanted to speak with the DEA regarding "information" he had in regards to his case. (Doc. 39-1 at 2.) At that point, Mr. Guzman-Dominguez had "not remained silent at all[,]" and consequently, those statements are admissible. *Anderson*, 447 U.S. at 408 (1980).

During the hearing, Mr. Guzman-Dominguez also indicated that conversations between Mr. Guzman-Dominguez and his counsel could provide necessary context for the conversation

between Mr. Guzman-Dominguez and his wife.   (Hr'g Tr. 44:17–19, 45:2–8.)   After Mr. Guzman-Dominguez made the calls the Government seeks to use as evidence, Mr. Guzman-Dominguez's counsel visited him in jail.   (*Id.* at 44:20–24.)   Mr. Guzman-Dominguez told counsel he was not guilty.   (*Id.* at 45:5–8.)   Mr. Guzman-Dominguez told counsel that he wanted to help the Government by participating in a controlled delivery to find the people who placed the drugs in his truck.   (*Id.* at 45:6–8.)   Mr. Guzman-Dominguez offered this same type of cooperation immediately after his arrest.   (*Id.* at 44:9–12.)   Now, Mr. Guzman-Dominguez asserts that this context explains the "information" he sought to provide to law enforcement.   (*Id.* at 51:17–22.)   Although not raised in the briefs, Mr. Guzman-Dominguez argues that allowing this testimony will cause a conflict of interest with his counsel, because his counsel may have to testify as to Mr. Guzman-Dominguez's desired means of cooperating.   (*Id.* at 48:14–24.)

This argument also fails, as Mr. Guzman-Dominguez has brought this difficult situation upon himself.   Neither the Court nor the Government has any obligation to protect Mr. Guzman-Dominguez from his own, post-Mirandized statements.   *See Berghuis*, 560 U.S. at 388. The Court does, however, have an obligation to admit relevant evidence that does not violate the United States Constitution, a federal statute, the Federal Rules of Evidence, or other rules promulgated by the U.S. Supreme Court.   Fed. R. Evid. 402.   As already discussed, admission of this statement does not violate Mr. Guzman-Dominguez's Fifth Amendment rights.   Mr. Guzman-Dominguez has failed to argue that admission of this evidence violates any other constitutional rights, statutes, or rules.

The telephone calls are also relevant.   Mr. Guzman-Dominguez said he had information about his case, not just a desire to cooperate.   (*See* Doc. 39-1 at 2.)   Mr. Guzman-Dominguez thought this information would help him get out sooner.   (*See* Docs. 39-3 at 3; 39-5 at 3.)   Such

20

evidence tends to prove that Mr. Guzman-Dominguez knew more about the drug trafficking operation than originally disclosed and thus, knew that he was transporting cocaine and heroin. *See* Fed. R. Evid. 401.   The telephone calls are consequently admissible against Mr. Guzman-Dominguez.

During the hearing, Mr. Rodriguez-Flores claimed that admitting Mr. Guzman-Dominguez's statements against Mr. Guzman-Dominguez would raise a *Bruton* issue. "In *Bruton v. United States*, 391 U.S. 123 . . . (1968), the Supreme Court held that in a joint trial, one defendant's 'powerfully incriminating extrajudicial statements' regarding a co-defendant violate the co-defendant's Sixth Amendment rights, despite instructions to the jury to disregard that evidence when determining guilt." *United States v. Rahseparian*, 231 F.3d 1267, 1276–77 (10th Cir. 2000).   This rule, however, is limited to "those few contexts where the statement is so inculpatory as to the defendant that the practical and human limitations of the jury system cannot be ignored." *United States v. Nash*, 482 F.3d 1209, 1218 (10th Cir. 2007) (quoting *Rahseparian*, 231 F.3d at 1277).   Specifically, *Bruton* does not protect defendants against co-conspirators' statements "that are not directly inculpatory but only inferentially incriminating." *Id.* (quoting *Rahseparian*, 231 at 1277) (holding that statements violated *Bruton* where "[t]he fact that [the defendant's] name was not mentioned [did] not alter [the] result" that the statements referred "directly to [the defendant]" by discussing a partner/driver).   Only in those narrow circumstances "where the inculpatory inference can be made immediately in the mind of a reasonable juror[,] is the statement protected by *Bruton* and any curative instruction insufficient." *Rahseparian*, 231 F.3d at 1278.

Mr. Guzman-Dominguez's statements do not directly implicate any co-conspirator, let alone Mr. Rodriguez-Flores specifically.   Mr. Guzman-Dominguez does not mention anyone else

who might have information about the case.   (*See* Docs. 39-1 through 39-5.)   Instead, they only involve Mr. Guzman-Dominguez's desire to speak with law enforcement about the information he possessed.   (*See id.*)   Consequently, admission of the statements against Mr. Guzman-Dominguez does not violate *Bruton* and a curative jury instruction can sufficiently protect Mr. Rodriguez-Flores.   *See Rahseparian*, 231 F.3d at 1278.

### E.  Photograph Motion in Limine

The Government next seeks to introduce as evidence several photographs of Mr. Guzman-Dominguez wearing a t-shirt with a photograph of Joaquin "El Chapo" Guzman with the words "Billionaire" printed on top and other phrases, including "The LAST NARCO[,]" surrounding the photograph.  (Doc. 48-2.)   Mr. Guzman-Dominguez is also wearing what appears to be a sidearm pistol.  (*Id.*)   The Government asserts that the photograph is probative of Mr. Guzman-Dominguez's knowledge that he was transporting cocaine and heroin, as it tends to prove that Mr. Guzman-Dominguez "idolized drug traffickers, saw drug trafficking as glamorous, and openly aligned himself with drug trafficking culture."  (*Id.* at 4.)   Mr. Guzman-Dominguez argues that the photographs are irrelevant and their admission into evidence would violate his right to free speech.   (Doc. 53 at 13–15.)

Artistic creations cannot be misused to infer that the artist is a criminal, and admissibility of such creations must be analyzed on a case by case basis.   *United States v. Long*, 774 F.3d 653, 665 (10th Cir. 2014).   Still, the analysis is the same as other extrinsic acts; the court must determine whether the evidence is introduced for a proper purpose and whether the probative value is not substantially outweighed by the danger of prejudice.   *Id.*   In *Long*, law enforcement found a music CD entitled "Cokeland" with a picture of the defendant on the cover pouring liquid from a liquor bottle into a measuring cup.   *Id.* at 664.   Law enforcement testified that "the image related

to the manufacture of cocaine base." *Id.*   The CD was found in a kitchen next to three baggies of cocaine, a digital scale with white powder on it, and a box of baking soda. *Id.* at 665.   Four men, including the defendant, were arrested in the kitchen. *Id.*   Based on these circumstances, the court determined that the CD was sufficiently probative to link the defendant to the cocaine as it "singled [the defendant] out" and tended to prove that the defendant owned both the CD and the cocaine that was in close proximity to where the CD was found. *Id.*   *See also United States v. Moore*, 639 F.3d 443, 448 (8th Cir. 2011) (determining a recording of the defendant rapping was admissible to show knowledge and motive where the defendant rapped about cocaine prices and drug code words); *United States v. Fraser*, 448 F.3d 833, 839–41 (6th Cir. 2006) (determining that book authored by defendant was admissible to rebut defendant's claim that he did not knowingly participate in a counterfeit check scheme where book excerpts described the scheme). *But see United States v. Gamory*, 635 F.3d 480, 493 (11th Cir. 2011) (determining a music video was not clearly probative of the defendant's guilt as the defendant was not in the video and had not authored the lyrics, and the video was unfairly prejudicial because it contained violence, profanity, sex, promiscuity, and misogyny).

The photograph here differs from the examples above in that Mr. Guzman-Dominguez's decision to pose for a photograph is not as active a creation as rapping or writing a book. *Cf. Long*, 774 F.3d at 665; *Fraser*, 448 F.3d at 839–41.   More importantly, however, the photograph is far less probative than the above examples.   Unlike the rap in *Moore*, Mr. Guzman-Dominguez's t-shirt shows only general "drug culture" images and slogans, not inside information probative of knowledge. *See Moore*, 639 F.3d at 448.   Nor does the t-shirt link Mr. Guzman-Dominguez's location to the drugs like *Long*, or prove knowledge by outlining the specific unlawful scheme. *See Long*, 774 F.3d at 665; *Fraser*, 448 F.3d at 839–41.   The

photograph also provides no impeachment value, because the Government has not proffered any statements by Mr. Guzman-Dominguez that he never associated with drug traffickers or that he renounced the broader drug trafficking culture.   (*See* Hr'g Tr. 57:4–13.)   Instead, it is much more like *Gamory*, which risks unfair prejudice by referencing violence and drug culture.   *See Gamory*, 635 F.3d at 493.   Worse than the video in *Gamory*, where the music lyrics linked the defendant's business to money laundering, *id.* at 488 n.9, the photograph here only links Mr. Guzman-Dominguez to ascribing to a "drug culture[,]" requiring the jury to make an unfounded and impermissible conclusion that people who wear "El Chapo" t-shirts are drug traffickers.   As such, the photographs do not tend to prove a proper purpose and their probative value is substantially outweighed by the risk for unfair prejudice.   *See* Fed. R. Evid.  401; 403.  The photographs are thus inadmissible.

### F.    Admissibility of Other Evidence

Mr. Guzman-Dominguez seeks to exclude information about the residency and citizen status of Mr. Guzman-Dominguez and other witnesses; Defendants' recent trips to El Salvador and Mexico; Mr.  Guzman-Dominguez  and  Mr.  Rodriguez-Flores's  girlfriends;  Mr. Guzman-Dominguez's  locked  cell  phone;  use  of  Mr.  Guzman-Dominguez's  car  to  smuggle marijuana (before Mr. Guzman-Dominguez owned the car); and any defendant or witness's criminal history.   (Doc. 71.)

### i.    *Residency, Citizen Status, and National Origin*

First, Mr. Guzman-Dominguez asks that the Court exclude information about the residency, citizen status, and national origin of Mr. Guzman-Dominguez and other witnesses. (Doc. 71 at 3–4.)  The Government responds that it does not intend to introduce evidence on Defendants' residency or citizenship status, but anticipates "that evidence related to [Defendants']

national origin will naturally come into evidence in connection with their statements about their trip to El Salvador . . . and their statements about how they came to know each other."   (Doc. 74 at 3.)   The Government further contends that this information is necessary to provide circumstantial evidence of their "lifestyles" to show their knowing involvement in drug trafficking and to provide context for other evidence relevant to the investigation.   (*Id.* at 4.)

"The Constitution prohibits racially biased prosecutorial arguments."   *McCleskey v. Kemp*, 481 U.S. 279, 310 n.30 (1987) (stating, in reference to jury selection, "If the circumstances of a particular case indicate a significant likelihood that racial bias may influence a jury, the Constitution requires questioning as to such bias").   In the context of evidentiary admissibility, other circuits have determined that testimony "tying the ethnic descent of a defendant to the ethnic characteristics of drug dealers in a specific geographic area" is insufficiently probative pursuant to Rule 401 and fails the Rule 403 analysis.   *See United States v. Vue*, 13 F.3d 1206, 1213 (8th Cir. 1994) (citing *United States v. Doe*, 903 F.2d 16, 20–22 (D.C. Cir. 1990); *United States v. Rodriguez Cortes*, 949 F.2d 532, 541–42 (1st Cir. 1991)).

Currently, the evidence the Government seeks to introduce does not tie Mr. Guzman-Dominguez or Mr. Rodriguez-Flores to drug trafficking based on ethnic descent.   *See Vue*, 13 F.3d at 1213.   Instead, the Government seeks only to provide information about how Defendants know each other and to provide context for suspicious circumstances immediately preceding the discovery of cocaine and heroin in Mr. Guzman-Dominguez's trailer.   (Doc. 74 at 4.)   As discussed below, evidence of Defendants' trip to El Salvador is probative to show unexplained wealth and uncommonly generous employee benefits.   (*See id.* at 5.)   Similarly, the context for the relationship between Defendants is relevant to determine whether they conspired to traffic drugs together.   To the extent that prejudice based on national origin would unfairly

prejudice jurors, Defendants should probe potential jurors in voir dire.   *See McCleskey*, 481 U.S.

at 310 n.30.    Thus, Mr. Guzman-Dominguez's motion to exclude this information is not

well-taken.

> ii.    *Trips to El Salvador and Mexico*

Next, Mr. Guzman-Dominguez seeks to exclude any reference to Defendants' recent trips

to El Salvador and Mexico.   (Doc. 71 at 1.)   The Government responds that the trip to El

Salvador is probative of Defendants' involvement of a drug trafficking conspiracy because:

> (1) the circumstances of the trip are unusual; (2) the trips . . . show that
> [Defendants] were in no hurry to get back to work; (3) the evidence suggests that
> Mr. Guzman covered travel expenses for himself, his girlfriend, and Mr.
> Rodriguez; (4) the trips are unusually extravagant for a truck driver and a[] ride
> along passenger; and (5) the perks of being Mr. Guzman's ride along
> passenger/employee are unusually generous.

(Doc. 74 at 5.)   During the hearing, the Government also discussed evidence that Defendants had

conflicting explanations for visiting Mexico.    (Hr'g Tr. 63:10–18.)    Whereas Mr.

Guzman-Dominguez stated they went to Mexico so he could get a molar pulled, Mr.

Rodriguez-Flores stated they went "to party and to meet with the girls."   (*Id.*)

The Government meets the low bar for establishing relevancy for the trips.   *See Jordan*,

485 F.3d at 1218.   Mr. Guzman-Dominguez's alleged expense to cover travel for three people is

probative of his unexplained wealth, which is probative of an illegitimate income.   *See Davis*, 789

F. Supp. at 1132.   As for Mr. Rodriguez-Flores, receipt of such benefits tends to show that Mr.

Rodriguez-Flores was providing Mr. Guzman-Dominguez with a service more valuable than

merely riding along with him on legitimate commercial deliveries.   Defendant's conflicting

stories are relevant for impeachment and to prove that Defendants may have had some other reason

for visiting Mexico.   The risk of unfair prejudice, to the extent that certain jurors may be

prejudiced against people from El Salvador or who visit Mexico, should be addressed in voir dire. *See McCleskey*, 481 U.S. at 310 n.30.   As discussed below, the risk of prejudice based on Defendant's desire to "meet with the girls" (Hr'g Tr. 16–17) will be remedied by excluding that specific evidence.   Still, evidence that Defendants traveled to El Salvador and Mexico, that Mr. Guzman-Dominguez paid for three people to take the trip, and that Defendants had conflicting explanations for their travel is admissible.

      *iii.*    *Defendants' Girlfriends*

Relatedly, Mr. Guzman-Dominguez seeks to exclude evidence of Defendants' girlfriends and alleged womanizing.   (Doc. 71 at 5.)   Mr. Guzman-Dominguez argues that the information is irrelevant and would be unfairly prejudicial because jurors could seek to punish him "for his romantic relations rather than any charged offense."   (*Id.* at 5.)   The Government anticipates introducing evidence regarding Mr. Guzman-Dominguez's extra-marital affair for two reasons. First, the Government seeks to show that Mr. Guzman-Dominguez owns the Apple iPhone seized during the stop, as he used the phone to call his girlfriend while in the presence of law enforcement.   (Doc. 74 at 5.)   Second, the Government intends to provide evidence that Mr. Guzman-Dominguez paid for his girlfriend to travel with him to El Salvador as evidence that Mr. Guzman-Dominguez's "lifestyle is inconsistent with that of a typical truck driver."   (*Id.* at 6.)

The fact that Defendants had girlfriends does not tend to prove any fact relating to the charges against Defendants.   Evidence that Mr. Guzman-Dominguez paid for three people to visit El Salvador is probative of his unexplained wealth, but evidence that one of the travelers was Mr. Guzman-Dominguez's girlfriend is not more probative of that wealth.   Similarly, evidence that Mr. Guzman-Dominguez used the Apple iPhone to make a call proves his ownership as much as evidence that he used the phone specifically to call his girlfriend.   Lastly, the conflicting

statements—Mr. Guzman-Dominguez's version that Defendants went to Mexico so he could get a molar pulled and Mr. Rodriguez-Flores's version that they went to party—is probative for credibility and alternate purpose, but the Government need not introduce evidence of "meet[ing] with the girls" (Hr'g Tr. 16–17) to make the evidence probative.   As evidence of the girlfriends is irrelevant and risks undue prejudice, it is excluded.

    *iv.    Locked or Inaccessible Cell Phones*

    Next, Mr. Guzman-Dominguez seeks to exclude evidence or testimony that his cell phones were locked or inaccessible.   (Doc. 71 at 5.)   The Government seeks to show that Mr. Guzman-Dominguez owned the seized Apple iPhone in part by introducing evidence that Mr. Guzman-Dominguez provided law enforcement officers with the code to unlock the phone.   (Doc. 74 at 6.)   The Government does not, however, anticipate introducing evidence that another seized cell phone was also locked.   (*Id.*; Doc. 67 at 16–17.)

    Evidence that Mr. Guzman-Dominguez knew the password to the Apple iPhone is relevant to show ownership.   Currently, there does not appear to be a relevant reason to admit evidence that the second phone remains inaccessible, but the Government does not seek to introduce such evidence.   (*See* Doc. 74 at 6.)   The Court denies Defendants' motion as to the Apple iPhone but grants the motion as to the phone that remains locked.

    *v.    Evidence Potentially Requiring Expert Testimony*

    Mr. Guzman-Dominguez also seeks to exclude evidence regarding commercial seals in drug smuggling operations, banking practices involving structured deposits, and cell tower data, alleging that these topics require expert testimony to explain and the Government has not provided notice of such experts.   (Doc. 71 at 6.)   "[T]he distinction between lay and expert witness testimony is that lay testimony results from a process of reasoning familiar in everyday life, while

expert testimony results from a process of reasoning which can be mastered only by specialists in the field." *United States v. Yeley-Davis*, 632 F.3d 673, 684 (10th Cir. 2011) (quoting Fed. R. Evid. 701 advisory committee's note to 2000 amendment). "Pursuant to [Federal Rule of Evidence] 702, courts must conduct a 'common-sense inquiry' into whether a juror would be able to understand certain evidence without specialized knowledge. *United States v. Garcia*, 635 F.3d 472, 476–77 (10th Cir. 2011) (quoting *Becker,* 230 F.3d 1224, 1231 (10th Cir. 2000)).

First, Mr. Guzman-Dominguez objects to any evidence involving commercial seals in drug smuggling operations. (Doc. 71 at 6.) The Government argues that it provided notice that DEA Agent Montoya would testify regarding commercial seals when it stated that he would testify about "[t]he manner in which individuals and organizations package, conceal, transport, and distribute cocaine and heroin throughout the United States, including the manner in which tractor trailers carrying a load of genuine cargo are used to conceal and transport controlled substance." (Doc. 74 at 7 (quoting Doc. 28).) The Government further clarifies that Agent Montoya will testify that:

> (1) drug traffickers use commercial vehicles to transport drugs; (2) drug traffickers introduce drugs into the cargo area of commercial vehicles after a legitimate load has been acquired in order to conceal the drugs; (3) once a commercial seal has been affixed to a commercial vehicle, it is more difficult to introduce drugs into the commercial vehicle without breaking the seal (i.e. at the pickup site); (4) once a commercial seal has affixed to a commercial vehicle, it is more difficult to remove drugs from the commercial vehicle (i.e. at the delivery site); (5) once a commercial seal has been broken it cannot be reattached; (6) a broken commercial seal is evidence that the cargo has been tampered with and can raise suspicions that are unwanted by drug traffickers; (7) as part of their efforts to conceal their drug trafficking activities, drug traffickers got to great lengths not to break the commercial seal . . . .

(*Id.* at 8.) As discussed in Section II(A)(ii), the Court defers this decision until voir dire at trial.

Regarding Mr. Guzman-Dominguez's bank records, the Government argues (1) that expert

testimony is unnecessary to introduce evidence of multiple cash deposits in one day; and (2) to the extent that expert testimony is necessary, DEA Agent Montoya is qualified to testify based on his experience in over 500 drug trafficking investigations, "many" of which included money laundering.   (Doc. 74 at 8–9.)   Specifically, the Government provides notice in response to Mr. Guzman-Dominguez's motion that Agent Montoya will testify that:

> (1) drug trafficking is a business; (2) drug trafficking is a cash-based business; (3) drug transactions are typically made in cash; (4) drug traffickers, including individuals who transport drugs, are typically paid in cash; (5) drug traffickers often attempt to introduce drug proceeds into the banking system to conceal the nature of these funds and to facilitate other purchases; and (6) drug traffickers often structure large cash deposits into bank accounts in order to avoid reporting requirements and to avoid suspicion related to large cash deposits.

(*Id.* at 9.)   Mr. Guzman-Dominguez argues that this evidence would risk confusion without an expert witness to interpret the information and it would otherwise waste the Court's time.   (Doc. 53 at 20 (citing Fed. R. Evid. 403.)

Mr. Guzman-Dominguez's argument that a jury could not understand a basic bank account statement is unsupported.   It is common practice for individuals to read their own bank statements, and their life experience is sufficient to consider whether multiple cash transactions in one day is out of the ordinary.   *See Garcia*, 635 F.3d at 476–77.   As the Government has not provided or sufficiently described the specific documents it intends to enter into evidence, however, the Court defers ruling on relevance at this time.

Conversely, if the Government wants to introduce evidence that drug traffickers often make multiple cash deposits a day *specifically* to avoid suspicion triggered by reporting regulations for large amounts of cash, it will have to qualify an expert.   The Government has proffered Agent Montoya for this purpose, and the Court reserves this issue until after voir dire at trial.

Lastly, the Government argues that an expert is unnecessary to testify to cell tower locations.  The Government argues that business record custodians, who will be called to authenticate the records, can sufficiently describe how the data from the records was obtained and "the meaning of the data in these business records."  (Doc. 74 at 9.)  Specifically, the Government seeks to introduce evidence "that when a person makes a call from the cell phone, it gets routed to a cell tower, and typically it's the closest cell tower or one in the vicinity of the cell phone."  (Hr'g Tr. 18:2–5.)

Tenth Circuit precedent does not entirely resolve this issue.  In *Yeley-Davis*, 632 F.3d at 677, the court considered testimony from a law enforcement agent, in which the agent explained various Verizon business records and "how cell phone towers operate."  Specifically, the agent explained that at certain times a cell phone tower will assign a different number to a cell phone if the call originates outside the cell phone's original service area.  *Id.* at 683–84.  Testifying that he learned this from prior cases, the agent assured the court that the second number still belonged to the co-conspirator's phone.  *Id.*  On review, the court found that the district court abused its discretion in allowing the agent to testify about "how cell phone towers operate" because it constituted expert testimony.  *Id.* at 684.  Still, the court determined that the error was harmless because "there [were] only three instances where a phone number was supposedly changed by a cell phone tower" and "[a]dmitting the testimony about how cell phones work did not have a substantial impact on the outcome of the case . . . ."  *Id.* at 685.

Two courts have since relied on *Yeley-Davis* for opposite rulings.  In *United States v. Henderson*, 564 F. App'x 352 (10th Cir. 2014), the court determined that testimony describing cell phone business records did not require expert testimony.  *Id.* at 360.  The court, reviewing for plain error, distinguished itself from *Yeley-Davis*, noting that most of the testimony in *Henderson*

31

consisted simply of reading cell phone records, which included the cell towers used to originate and terminate the call.  *Id.* at 361, 362.  Based on this information, a jury could see that the defendant's cell phone pinged off one cell tower when he was undisputedly at a certain house.  *Id.* at 361.  The records also showed that his cell phone pinged off different cell towers at two other times when the defendant claimed to be at the same house.  *Id.*  "The import of this information" was explained in the last exhibit, to which the defendant did not object.  *Id.*  The last exhibit was a map of the area, which showed the range of each cell phone tower.  *Id.*  The map showed that the house was almost directly under the tower that served the first call, which was undisputedly made from that location.  *Id.*  The court determined that testimony based on the phone records did not require expert testimony, and the defendant waived any objection involving testimony based on the map.  *Id.* at 362, 364.

In the last relevant case, the district court in *United States v. Banks*, 93 F. Supp. 3d 1237 (D. Kan. 2015) determined that only experts could testify as to the range covered by cell phone towers and the likelihood that cell phones were consequently located within a general area during certain calls.  *Id.* at 1248–49.  The court noted that the following information was necessary to determine whether the cell phone tower data could reliably indicate the general location of the cell phone:

> (1) how cell towers communicate with cell phones; (2) how cell towers create coverage areas; (3) the relationship between coverage areas and tower connections; and (4) the relative importance of physical proximity and non-proximity factors for determining whether a cellular phone will connect to a particular cell tower.

*Id.* at 1248–49.  Notably, the expert testifying in this case relied on maps to show cell tower coverage areas and described how cell phones may not use the nearest cell phone tower under certain conditions.  *Id.* at 1246.  Consequently, the court concluded that the government could

32

not "prove the physical location of the cell phones with cell-site data unless it [could] establish a sufficient relationship between [the] two through expert testimony."   *Id.* at 1249.

Based on these two, non-precedential cases, the Court determines that the Government need not qualify an expert to provide testimony based on admitted business records involving cell phone data where a juror may reasonably infer that a call was made from a general area based solely on those records.   *See Henderson*, 564 F. App'x at 361 (noting that the cell phone used a different tower at the time the defendant was confirmed to be at a certain location).   Conversely, an expert is necessary to describe maps of cell tower location coverage and to extrapolate, based on those maps, the potential location of a cell phone, especially if a juror would have to distinguish between the coverage area of nearby cell phone towers.   *See id.* at 364; *Yeley-Davis*, 632 F.3d at 685; *Banks*, 93 F. Supp. 3d at 1249.

Here, the Government appears to only seek to use cell phone records, not cell phone tower coverage maps, to show that Defendants remained in a certain area covered by a certain set of cell towers.   (*See* Hr'g Tr. 19:19–20:8 ("And if [the cell towers show] you're in Phoenix over and over and over again, you know, you're not in . . . Kansas[.   T]hat's kind of what we care about."); *id* at 20:1–9 (Defendants conceding to Government's intended use of the cell phone records).)   Such evidence does not require an expert.

  *vi. Honda Accord*

Mr. Guzman-Dominguez also seeks to exclude evidence involving his Honda Accord. (Doc. 71 at 6.)   Before Mr. Guzman-Dominguez owned the Honda Accord, it was used to smuggle 4.25 pounds of marijuana from Mexico to El Paso, Texas.   (*Id.*)   The Government does not intend to offer evidence involving previous drug trafficking with this car, but seeks to provide evidence that Defendants used the car to get back and forth from Mexico.   (Hr'g Tr. 70:2–14.)

The Court denies Defendant's motion on this point, but will allow them to renew their motion if the Government presents evidence different from that proffered.

### vii.     Bank Accounts and Financial Transactions

Mr. Guzman-Dominguez reasserts his objection to the Wells Fargo bank records and also objects to other "testimony or evidence concerning a number of bank accounts and financial transactions . . . ."   As discussed in Section II(C)(ii), the Government's description of "banking records related to [Mr. Guzman-Dominguez] for the 2015 calendar year" is general and may include both relevant and irrelevant material.   Thus, the Court defers this matter until trial.

### viii.     Criminal History

Mr. Guzman-Dominguez also seeks to exclude evidence or testimony regarding either Defendants' criminal history or the criminal history of other witnesses, arguing that admission of any criminal history would be unfairly prejudicial.   (Doc. 71 at 7.)   If Mr. Rodriguez-Flores testifies, the Government intends to impeach his testimony with his criminal history.   (Doc. 74 at 15.)   Mr. Rodriguez-Flores was convicted for "possession of a narcotic controlled substance" and he was sentenced on December 27, 2007 to 28 days in jail and 18 months' probation.   (*Id.* at 15.) Neither party provides sufficient information regarding the specific crime or whether it was punishable by more than a year of incarceration.   (*See* Hr'g Tr. 71:3–17, 71:20–21.)   In a post arrest statement, Mr. Rodriguez-Flores admitted to a history of drug use, which the Government also intends to offer against him.   (Doc. 74 at 15.)

Federal Rule of Evidence 609(a)(a)(1) requires that courts admit criminal convictions to attack a defendant witness's credibility if (1) the crime was punishable by imprisonment for more than a year; and (2) "the probative value of the evidence outweighs its prejudicial effect to that defendant."   For cases involving possession of drugs with intent to distribute, a prior drug

34

conviction may be probative of knowledge, especially where the defendant, of his own accord, denies any previous involvement with drugs.   *See United States v. Lugo*, 170 F.3d 996, 1005 (10th Cir. 1999).   Still, "[a] conviction for drug possession is not necessarily relevant to credibility and is potentially prejudicial in arousing sentiment against a witness."   *United States v. Begay*, 144 F.3d 1336, 1338 (10th Cir. 1998).   "Proof of prior convictions of a defendant for crimes identical or similar to the one for which he is being tried should be carefully scrutinized by the trial court in determining whether the probative value of such evidence outweighs the prejudice to the defendant."   *States v. Seamster*, 568 F.2d 188, 191 (10th Cir. 1978).   Regardless, the circuit grants broad discretion to the district court as long as the district court has heard and considered all material evidence presented at trial prior to ruling.   *Id.* (determining that the court was within its discretion to admit two prior convictions of burglary in a burglary case even though the case did not turn on credibility); *see also United States v. Mejia-Alarcon*, 995 F.2d 982, 987 n.2 (10th Cir. 1993) (stating that a court cannot fully balance the probative value and prejudicial effect until trial, as the decision requires "assessment of the evidence that ha[s] come in up to the point of its admission").

As neither party has indicated the specific crime and Mr. Rodriguez-Flores was only incarcerated for 28 days, it is unclear whether the crime was punishable by imprisonment for more than a year.   The Court thus defers this issue to trial.

## III.   CONCLUSION

Having reviewed the parties' submissions and considered their arguments regarding expert witnesses, the Court **ORDERS** that:

- Department of Homeland Security (DHS) Forensic Scientist Dustin James is qualified and seeks to provide reliable expert testimony on forensic chemistry and the identification of

controlled substances (Doc. 32);

- Drug Enforcement Administration (DEA) Special Agent Joseph Montoya is qualified and seeks to provide reliable expert testimony on drug trafficking and the operations of drug trafficking organizations (Doc. 28) as described in this order, but the Court defers until trial determination on Agent Montoya's expertise as to the use of commercial vehicles in drug trafficking and practices, especially those involving commercial seals (*see* Doc. 71 at 6); and drug traffickers' use of structured cash deposits to avoid reporting requirements (*see* Doc. 71 at 6); and

- New Mexico State Police Officer Davin Barela is qualified and seeks to provide reliable expert testimony on the regulation and inspection of commercial trucks (Doc. 35) as described in this order, but Officer Barela is not qualified to testify about general practices of commercial truckers beyond their desire to deliver loads as quickly as possible.

- The Court defers for trial the determination on whether former DHS Federal Criminal Investigator/Special Agent Robert Alvarez is qualified and seeks to provide reliable expert testimony on the common practice and characteristics of drug trafficking within the United States (Doc. 64).

Having reviewed the parties' submissions and considered their arguments regarding self-authenticating documents, the Court **ORDERS** that:

- The Pilot Center Travel receipt (Doc. 40) requires no further authentication to be introduced at trial;

- The Flying J receipt (Doc. 41) requires no further authentication to be introduced at trial;

- The Sprint cell phone records (Doc. 42), except for the Key to Understanding Document,

require no further authentication to be introduced at trial;

- The internal Mirachem records (Doc. 43), except for training documents described in this order, require no further authentication to be introduced at trial;

- The Mirachem e-mail exchange (Doc. 44) is authenticated as to e-mails sent by Mirachem employees but requires authentication as to responses sent by C.H. Robinson employees;

- The Wells Fargo bank records (Doc. 45) require no further authentication to be introduced at trial; and

- The Metro PCS cell phone records (Doc. 61) require no further authentication to be introduced at trial.

Having reviewed the parties' submissions and considered their arguments regarding 404(b) evidence, the Court **DEFERS** until trial:

- Determining admissibility of bank records (Doc. 51) related to Mr. Guzman-Dominguez for the 2015 calendar year.

Having reviewed the parties' submissions and considered their arguments regarding certain telephone calls, the Court **GRANTS:**

- United States Motion *In Limine* Regarding Admissibility of Evidence (Doc. 39) and determines that the telephone calls are admissible against Mr. Guzman-Dominguez.

Having reviewed the parties' submissions and considered their arguments regarding certain photographs, the Court **DENIES:**

- United States' Motion *In Limine* Regarding Admissibility of Photographs of Jose Remberto Guzman-Dominguez Wearing a Sidearm Pistol and a Joaquin "El Chapo" Guzman T-Shirt (Doc. 48) and determines that the photographs are inadmissible against both Mr.

Guzman-Dominguez and Mr. Rodriguez-Flores.

Having reviewed the parties' submissions and considered their arguments regarding exclusion of certain evidence, the Court:

- **DENIES** in part Defendants' Motion in Limine to Exclude Irrelevant and Unfairly Prejudicial Evidence (*see* Doc. 71 at 3–4) as it relates to reference to or evidence of Mr. Guzman Dominguez's or any other witness's residency, citizenship status, or national origin to the extent that Mr. Guzman-Dominguez and Mr. Rodriguez-Flores's national origin is admissible as discussed in this order;

- **DENIES** in part Defendants' motion (*see* Doc. 71 at 4–5) as it relates to Defendants' trips to El Salvador and Mexico;

- **GRANTS** in part Defendants' motion (*see* Doc. 71 at 5) as it relates to Defendants' girlfriends and alleged womanizing;

- **DENIES** in part Defendants' motion (*see* Doc. 71 at 5–6) as it relates to Mr. Guzman-Dominguez's locked Apple iPhone as described in this order, but **GRANTS** in part (Doc. 71) as it relates to any other locked phones that have been seized;

- **DEFERS** until trial determining admissibility of expert or other evidence on commercial seals and banking practices within drug trafficking organizations (*see* Doc. 71 at 6) and **DENIES** in part Defendants' motion (*see* Doc. 71 at 6) to exclude expert or other evidence on cell-site data as described in this order;

- **DENIES** Defendants' motion (*see* Doc. 71 at 6) as it relates to evidence of a Honda Accord, to the extent that the Government may introduce evidence as discussed in this order;

- **DEFERS** Defendants' motion (*see* Doc. 71 at 6–7) as it relates to relevance of evidence

regarding bank accounts and financial transactions as described in this order; and

- **DEFERS** until trial determining admissibility of evidence regarding Defendants' or witness's criminal history (*see* Doc. 71 at 7).

 **THEREFORE**,

 **IT IS ORDERED** that experts are qualified pursuant to the notices of intent in Docs. 32, 28, and 35 with some limitations; Documents described in Docs. 40, 41, 42, 43, 44, 45, and 61 do not, with limitations discussed in this order, require additional authentication at trial; United States Motion *In Limine* Regarding Admissibility of Evidence (Doc. 39) is **GRANTED**; United States' Motion *In Limine* Regarding Admissibility of Photographs of Jose Remberto Guzman-Dominguez Wearing a Sidearm Pistol and a Joaquin "El Chapo" Guzman T-Shirt (Doc. 48) is **DENIED**; and Defendants' Motion in Limine to Exclude Irrelevant and Unfairly Prejudicial Evidence (Doc. 71) is **GRANTED IN PART AND DENIED IN PART**.

          _____
          **ROBERT C. BRACK**
          **UNITED STATES DISTRICT JUDGE**