## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

       **Plaintiff,**

**vs.**                             **No. 2:16-cr-00580-RB**

**JOSE REMBERTO GUZMAN-DOMINGUEZ and MIGUEL ANGEL RODRIGUEZ-FLORES,**

       **Defendants.**

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER DENYING JOINT MOTION TO SUPPRESS EVIDENCE AND STATEMENTS

**THIS MATTER** is before the Court on Defendants' Joint Motion to Suppress Evidence and Statements (Doc. 37). Defendants Jose Remberto Guzman-Dominguez and Miguel Angel Rodriguez-Flores are charged with: (1) conspiracy to distribute 5 kilograms and more of cocaine and 1 kilogram and more of heroin, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A); (2) possession with intent to distribute 5 kilograms and more of a substance containing a detectable amount of cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A) and 18 U.S.C. § 2; and (3) possession with intent to distribute 1 kilogram and more of a substance containing a detectable amount of heroin, in violation of § 841(a)(1) and (b)(1)(A) and 18 U.S.C. § 2. (Doc. 23.) Defendants seek to suppress evidence and statements by challenging the administrative inspection that produced the initial evidence. (Doc. 37 at 4.) The Court held a hearing on June 14, 2016, to consider the matter. (Doc. 73 at 1.) Having reviewed the parties' submissions and considered their arguments, the Court **DENIES** the motion.

## I.    FINDINGS OF FACT

1.    The Lordsburg, New Mexico, Port of Entry is a permanent installation authorized by N.M. Stat. Ann. § 65-5-1 (1978) and operated by the New Mexico Motor Transportation Police Division.   (*See* Gov. Ex. 2.)

2.    Inspector Jesus Salcedo works for the State of New Mexico at the Lordsburg Port of Entry. (Doc. 73 at 19:23–20:2.)

3.    As an inspector, he conducts safety inspections, which include Level 1, Level 2, and Level 3 inspections on commercial vehicles.   (*Id.* at 20:12–14.)

4.    A Level 3 inspection includes an inspection of all paperwork, including licenses and permits.   (*Id.* at 20: 17–19.)

5.    A Level 2 inspection includes the same review of paperwork and a walk around the vehicle.   (*Id.* at 20:19–21.)

6.    A Level 1 inspection includes a thorough inspection of the driver, the commercial vehicle, and the cargo.   (*Id.* at 21:7–11.)

7.    For each shift, inspectors conduct only one level of inspections, which a supervisor assigns in a daily schedule.   (*See id.* at 21:15–19.)

8.    When Inspector Salcedo is assigned Level 1 inspections, he typically begins his shift by logging onto his computer, making sure everything is running okay, going to the primary booth—where vehicles initially stop—and selecting a commercial vehicle to inspect.   (*See id.* at 22:4–7.)

9.    Most of the time, Inspector Salcedo selects the first commercial vehicle that enters the primary booth after he arrives.   (*Id.* at 22:12–16.)

10. On November 14, 2015, Inspector Salcedo began his shift at 12:00 a.m.; he was assigned

2

Level 1 inspections.    (*Id.* at 22:17–20.)

11. At 12:29 a.m. on November 14, 2015, a white, registered commercial tractor-trailer pulled into the Lordsburg Port of Entry.    (Gov. Exs. 1 at 00:11–00:18; 3; 4.)

12. Mr. Guzman-Dominguez was driving the vehicle and Mr. Rodriguez-Flores was riding in the cab as a passenger.    (Doc. 73 at 23:12–20, 24:1–16.)

13. When the tractor-trailer stopped at the primary booth, Inspector Salcedo asked Mr. Guzman-Dominguez whether the passenger was a co-driver.    (Gov. Ex. 1 at 00:20–00:27.)

14. Mr. Guzman-Dominguez told Inspector Salcedo that Mr. Rodriguez-Flores was "just a ride-along" and then Inspector Salcedo asked Mr. Guzman-Dominguez for his logbook.    (*Id.* at 00:24–00:30.)

15. Before looking at the logbook, Inspector Salcedo decided to inspect the vehicle and instructed Mr. Guzman-Dominguez to pull into the bay for a Level 1 inspection.    (*Id.* at 00:43–00:53.)

16.  Inspector Salcedo decided to inspect the tractor-trailer, as he needed to begin inspecting vehicles and he wanted to verify that the passenger had permission to be in the vehicle.    (Doc. 73 at 25:4–9, 28:6–11.)

17. As Mr. Guzman-Dominguez was driving into the inspection bay, Inspector Salcedo looked at the logbook.    (Gov. Ex. 1 at 1:05–1:12.)

18. Inspector Salcedo was surprised that the logbook indicated Mr. Guzman-Dominguez had been off duty for seven days.    (*Id.*; *see also* Doc. 73 at 27:16–23.)

19. Inspector Salcedo thought that it was unusual that Mr. Guzman-Dominguez was off duty in Phoenix, Arizona, instead of Las Vegas, Nevada, where his company was based.    (Doc. 73 at 27:24–28:5.)

3

20. Inspector Salcedo also thought it was unusual that the logbook did not include reporting for the entire month.   (*Id.* at 27:1–7.)

21. At the inspection bay, Inspector Salcedo reviewed Mr. Guzman-Dominguez's bill of lading, which describes the cargo a tractor-trailer is hauling.   (*Id.* at 29:17–30:4.)

22. Mr. Guzman-Dominguez's bill of lading indicated he was transporting 17 large containers of cleaning material for a company called Mirachem.   (*Id.* at 30:5–25; Gov. Exs. 6; 7.)

23. While Inspector Salcedo inspected the tractor-trailer, Mr. Guzman-Dominguez interrupted him several times, which Inspector Salcedo thought was unusual.   (Doc. 73 at 31:14-33:5.)

24. The cargo gate was locked with a padlock instead of a commercial seal, which Inspector Salcedo thought was unusual.   (*Id.* at 33:24–34:2, 36:16–19.)

25. Inspector Salcedo asked Mr. Guzman-Dominguez to unlock the cargo area and Mr. Guzman-Dominguez had trouble finding the correct key; Inspector Salcedo thought that was unusual too.   (*Id.* at 37:2–25.)

26. Once the cargo area was open, Inspector Salcedo checked to make sure none of the shipping containers had shifted.   (*Id.* at 39:7–8.)

27. The cargo consisted exclusively of over 40,000 pounds of cleaning liquid.   (*See* Gov. Exs. 6; 7.)   The liquid was held in 17 opaque plastic containers, encased in a metal cage, which were clearly marked with printed Mirachem labels and instructions.   (*Id.*)

28. Inspector Salcedo climbed into the trailer and checked the entire length of the trailer for safety issues, such as holes in the trailer or containers that had shifted.   (*Id.* at 39:11–40:6.)

29. Sticking out like a sore thumb amongst the clearly conforming cargo were four random cardboard boxes with handwritten words scrawled across them in black permanent marker. (*Compare* Gov. Ex. 7 *with* Gov. Ex. 8.)

4

30. One of the boxes was open, and Inspector Salcedo shined his flashlight into the box and saw bundles wrapped in green cellophane.   (*Id.* at 40:7–25.)

31. Believing the boxes contained illicit materials, Inspector Salcedo called for back-up.   (*Id.* at 42:17–22, 43:12–16.)

32. Law enforcement looked inside the open box, saw the packages, and arrested Mr. Guzman-Dominguez and Mr. Rodriguez-Flores.   (*Id.* at 44:5–9, 45:19–24, 46:1–4, 47: 7–14.)

33. Law enforcement then opened the remaining boxes and discovered that all four boxes contained cellophane encased bundles, which appeared to carry narcotics.   (*Id.* at 47:15–23; Gov. Ex. 12.)

34. Inspector Salcedo completed his inspection; he found eight violations, only one of which was related to the narcotics load.   (Doc. 73 at 48:13–49:25; Gov. Ex. 18.)

35. Law enforcement obtained additional evidence by searching the cab and interviewing Mr. Guzman-Dominguez and Mr. Rodriguez-Flores.   (*See* Gov. Exs. 14; 14A; 16; 16A; 21; 23; 27; 28; 29; 30; 31; 32; 33.)

## II.   CONCLUSIONS OF LAW

### A.  Administrative Search

1.  "The Fourth Amendment protects the right of the people to be secure . . . against unreasonable searches and seizures."   *United States v. Herrera*, 444 F.3d 1238, 1242 (10th Cir. 2006) (quoting *United States v. Bradford,* 423 F.3d 1149, 1156 (10th Cir. 2005)).

2.  This protection extends to commercial contexts, but the expectation of privacy in "pervasively regulated" industries is "different from, and indeed less than" the expectation in a private home.  *New York v. Burger*, 482 U.S. 691, 699–700 (1987).

3.  Courts recognize an "established exception to the warrant requirement for administrative

inspections" related to a "closely regulated" business.   *Id.* at 703.

4.   Administrative schemes for inspections are reasonable where, (1) "the regulatory scheme [is] informed by a substantial government interest"; (2) "warrantless inspections [are] necessary to further the regulatory scheme"; and (3) "the inspection program . . . provide[s] a constitutionally adequate substitute for a warrant in terms of the certainty and regularity of its application." *United States v. Mitchell*, 518 F.3d 740, 751 (10th Cir. 2008) (citing *Buger*, 482 U.S. at 702–03).

5.   Importantly, "[t]he *Burger* criteria apply to a regulatory scheme generally, not to the particular search at issue."   *United States v. Gwathney*, 465 F.3d 1133, 1139–40 (10th Cir. 2006) (quoting *United States v. Maldonado,* 356 F.3d 130, 136 (1st Cir. 2004); *see also United States v. Bulacan*, 156 F.3d 963, 969 (9th Cir. 1998), *as amended* (Nov. 16, 1998) ("[I]n determining whether the scheme is valid, the Court should consider the entire class of searches permissible under the scheme, rather than focusing on the facts of the case before it.").

6.   Courts apply the same requirements to evaluate administrative schemes involving "[t]he random detention and inspection of a vehicle used in a closely regulated industry" as those permitting a "warrantless regulatory search of business premises."   *Herrera*, 444 F.3d at 1244 (quoting *V–1 Oil Co. v. Means*, 94 F.3d 1420, 1425 (10th Cir. 1996)).

7.   New Mexico has a statutory scheme to administratively inspect commercial motor vehicles.   N.M. Stat. Ann. §§ 65-5-1 through 65-5-5; *see also United States v. Vasquez-Castillo*, 258 F.3d 1207, 1211 (10th Cir. 2001).

8.   The Tenth Circuit has upheld this statutory scheme, determining that the statute "provides adequate notice to owners and operators . . . that their property will be subject to periodic inspections and adequately limits the discretion of inspectors in place and scope." *Vasquez-Castillo*, 258 F.3d at 1211.

6

9.   The statutory scheme requires "[a]ll commercial motor carrier vehicles . . . [to] stop at every port of entry" in the state.   N.M. Stat. Ann. § 65-5-1(A).

10. At New Mexico ports of entry, all commercial motor carrier vehicle drivers shall present "a copy of the billing or invoice describing the contents of the cargo and the weight of the cargo" for inspection.   N.M. Stat. Ann. § 65-5-1(C)(3).

11. The agent at the port of entry shall "check the license, permit, engine, and serial numbers, weight and description of the vehicle; and . . . inspect the vehicle and ascertain whether it is in safe and road-worthy condition and properly equipped with all lights, brakes and other appliances required by law."   N.M. Stat. Ann. § 65-5-1(D).

12. The agent may also "verify the information contained upon the billing or invoice . . . ." N.M. Stat. Ann. § 65-5-1(D).

13. The agent may "confirm the contents and weight of the cargo, and interview the [driver] about the cargo . . . ."   N.M. Stat. Ann. § 65-5-1(E).

14. The agent may also "'inspect the vehicle *and its contents* to determine whether" drivers have complied with New Mexico rules and regulations regarding public safety, health, and welfare.   *Vasquez-Castillo*, 258 F.3d at 1211 (quoting N.M. Stat. Ann. § 65-5-1(G) (1978)) (emphasis added in *Vasquez-Castillo*).

15. The Court need not determine whether, as Defendants assert, individual searches are invalid if conducted without any particularized suspicion of a regulatory violation (*see* Doc. 73 at 64:18–21), as the Court has determined that Inspector Salcedo decided to inspect the truck in part to ensure that the passenger was authorized to ride in the commercial vehicle.   (*See infra* at 3 ¶ 18.)

16. Even if the stop was random, the statutory scheme, approved by *Vasquez-Castillo*, allows

7

random stops.   *Vasquez-Castillo*, 258 F.3d at 1211–12.

17. The *Vasquez-Castillo* court considered the entire range of investigatory stops permitted by the statutory scheme, including random stops, and concluded that the statutory scheme satisfied the *Burger* test.   *Vasquez-Castillo*, 258 F.3d at 1211–12 ("It could reasonably be concluded that random truck safety inspections are necessary to further that interest.") (quoting *V-1 Oil Co.*, 94 F.3d at 1426).[1]

18. Defendants also argue that the administrative search in this case "was a pretext or at least evolved into a pretext" to search for narcotics.   (Doc. 73 at 65:8–15.)

19. "Although the government may address a problem in a regulated industry through administrative and penal sanctions, an administrative inspection may not be used as a pretext solely to gather evidence of criminal activity."   *United States v. Johnson*, 994 F.2d 740, 742 (10th Cir. 1993) (citing *Burger*, 482 U.S. at 712).

20. Here, the Level 1 inspection was not "solely a pretext to gather evidence of criminal activity," *Johnson*, 994 F.2d at 742, as Inspector Salcedo looked for, and found multiple safety violations.   (*See infra* at 4 ¶ 28, 5 ¶ 35.)

21. More specifically, Inspector Salcedo did not inspect the cargo area just to look for drugs; he walked the length of the trailer to make sure all legitimate cargo was properly secured.   (*See infra* at 4 ¶¶ 28–29; Gov. Ex. 7; Doc. 73 at 39:11–40:6.)

22. Thus, Inspector Salcedo was conducting a valid inspection pursuant to N.M. Stat. Ann. § 65-5-1(G) when he discovered the clearly non-conforming cargo: four cardboard boxes, one of

---

[1] Additionally, other circuits have upheld similar statutory schemes that involve random stops. *See United States v. Fort*, 248 F.3d 475, 482 (5th Cir. 2001); *United States v. Branson*, 21 F.3d 113, 117 (6th Cir. 1994) (noting that the Court in *Burger* specifically stated that the record did not indicate why the administrative search was conducted in that case) (citing *Burger*, 482 U.S. at 694 n.2).

which was open and contained green bundles wrapped in cellophane.   (*See* Doc. 73 at 40:4–25.)

**B.  Probable Cause to Open the Boxes**

23. Probable cause to justify a search for evidence of a crime may develop during an administrative inspection.  *Vasquez-Castillo*, 258 F.3d at 1213.

24. "Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the [vehicle] contains contraband or evidence."  *Id.* at 1212 (quoting *United States v. Downs*, 151 F.3d 1301, 1303 (10th Cir. 1998)).

25. In *Gwathney*, 465 F.3d at 1140, an inspector first entered the cargo area pursuant to an administrative search, but the court determined that probable cause developed during the search, allowing law enforcement to open non-conforming packages and search for contraband.

26. Here, Inspector Salcedo had probable cause to believe that the boxes in Mr. Guzman-Dominguez's tractor-trailer contained evidence of a crime.

27. Before Inspector Salcedo entered the cargo area, the following circumstances may have aroused suspicion: Mr. Guzman-Dominguez took seven days' vacation after arriving in Phoenix, which is not his home base (*see* Doc. 73 at 27:24–28:5); Mr. Guzman-Dominguez's logbook did not cover the entire month (*id.* at 27:1–7); Mr. Guzman-Dominguez interrupted Inspector Salcedo several times during the inspection (*id.* at 31:14–33:5); and the cargo gate was not sealed, but was instead locked with a padlock (*id.* at 33:24–34:2; *id.* at 36:16–19).

28. Once Inspector Salcedo found the boxes, these suspicious circumstances transformed to probable cause, as the boxes looked nothing like the large plastic shipping containers built to hold thousands of pounds of liquid.   (*Id.* at 40:4–7; Gov. Exs. 6; 7; 8.)

29. What's more, Inspector Salcedo could see, without opening the boxes, that one of the boxes contained bundles wrapped in green cellophane.   (*Id.* at 40:7–25.)

30. In all, these circumstances indicated a fair probability that the boxes contained contraband, establishing probable cause to open the boxes.  *See Vasquez-Castillo*, 258 F.3d at 1213; *cf. Gwathney*, 465 F.3d at 1140.

31. Thus, evidence from the boxes is admissible and other evidence obtained after Defendants' arrests shall not be excluded as fruit of the poisonous tree.

**THEREFORE,**

**IT IS ORDERED** that Defendants Joint Motion to Suppress Evidence and Statements (Doc. 37) is **DENIED**.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**